### DRIER *v.* GRACEY.

1. LIFE ESTATES—RENTS AND INCOME, TITLE TO.
   The owner of a life estate in real property is entitled to the rents and income derived therefrom.

2. SAME—WILLS—RENTS AND INCOME, TITLE TO.
   Where a husband's will gave to the widow a life estate in both the real and personal property, with the power to use from the *corpus* of the estate, if necessary, for her reasonable care and support, but which privilege was

See notes in 6 L. R. A. (N. S.) 1186; 36 L. R. A. (N. S.) 835; 39 L. R. A. (N. S.) 805.

never exercised, *held*, that the rents and income derived therefrom was her sole property, and on her death belonged to her estate.

3. Cancellation of Instruments—Deeds—Incompetency—Undue Influence—Fraud.

On a bill by plaintiff against the estate of his foster mother to have certain conveyances of a farm between the latter and himself set aside on the ground of plaintiff's incompetency, undue influence and fraud, where by the will of the foster father the widow was devised a life estate in the farm and at her death the title was to vest in plaintiff and an adopted daughter, but the widow bought the interest of the adopted daughter and sold the farm to plaintiff, later, at his request, purchasing it back from him, evidence *held*, insufficient to establish plaintiff's incompetency, or that he was unduly influenced or defrauded either in the purchase or sale of said farm.

Appeal from Montcalm; Davis, J. Submitted April 3, 1918. (Docket No. 19.) Decided December 27, 1918.

Bill by Henry Drier, guardian of Frank Larsen, against James Gracey, administrator *de bonis non* of the estate of Mathias Larsen, deceased, and others, for a construction of the last will of Mathias Larsen, to set aside certain conveyances, and for an accounting. From a decree for plaintiff, defendants appeal. Reversed, and bill dismissed.

*Rarden & Rarden*, for plaintiff.

*N. O. Griswold* (*M. V. Cook*, of counsel), for defendants.

Bird, J. Mathias Larsen was the owner of 120 acres of land in the township of Eureka, Montcalm county, upon which he resided with his wife and two adopted children, Flora and Frank Larsen. In December, 1890, he died testate. The two provisions of his will which are in dispute are as follows:

"I give, devise and bequeath to my beloved wife, Mary Larsen, all my real estate, lands, tenements, and hereditaments, of every kind and nature, wherever the

same may be situated, and all my personal estate, goods, chattels, moneys and effects, of every kind and nature, for and during her natural lifetime and until her decease, after the payment of my just debts and expenses of the last sickness and funeral (if any such there be). It being my will that my said wife shall and I do hereby give to her the privilege and power of disposing and conveying away any portion of said real or personal estate that may be necessary to be disposed of for her support, maintenance and comfort so long as she shall live provided the increase and rents and profits of the same estate shall not be sufficient for that purpose and also the right to turn off and dispose of such of said personal estate as shall to her seem best on account of age or wear and tear substituting others in the place and stead of the same, or keeping it good by increase, hereby giving to her full power to manage the same according to and dispose of it as in her judgment seems best.

"*Secondly:* The rest and residue and remainder of my said real and personal estate, goods, chattels and effects after the decease of my said wife I do hereby give, devise and bequeath to Frank Larsen and Flora L. Larsen, adopted children of mine to be divided between them share and share alike."

The will was admitted to probate and Mary Larsen, his widow, qualified as executrix and took charge of the estate. For two years she rented the farm. After that she and Frank, the adopted boy, worked and managed it. In 1895 the adopted daughter, Flora, having married, was desirous of disposing of her undivided half in the farm subject to her mother's life estate, so her mother purchased it for $1,000. In 1900 Frank married and brought his wife to the home. It soon became evident, as it usually does, that the house was too small for both families, and as a result the mother offered to purchase Frank's interest for $1,500, or to sell hers for $1,500, reserving certain timber of the estimated value of $500. Frank elected to, and did, purchase her interest in the farm, giving her a mortgage thereon for $1,500. At the end of the sec-

ond season Frank became dissatisfied and wanted to sell the farm, so the mother purchased it, giving him $900 in cash and canceling the $1,500 mortgage, and as a further consideration permitted him to retain all of the household goods and personal property on the farm in which she had an interest, amounting in value to over $600. Mary Larsen returned to the farm and operated it until October, 1907, when she sold it on contract to George W. and John F. Nelson, for $4,000. Mary Larsen then purchased a home in the city of Greenville, where she resided until her death, in September, 1912. She died testate, leaving her estate to a brother and to the children of a deceased brother.

With the $900 paid by his mother and $750 which he had accumulated from the avails of the farm, Frank purchased 40 acres nearby, known as the Slattery farm, and moved onto it. In 1904 he traded this 40 acres for the Shearer farm, consisting of 80 acres. In 1907 he sold 40 acres of the Shearer farm and paid his mortgage. In 1911 he traded the remaining 40 to one Cooper for another 40 in the same township. This trade with Cooper Frank soon regretted. It was not an advantageous one, and he was very desirous of getting rid of it. Some time in 1911 Frank was declared mentally incompetent by the probate court, and a guardian was appointed. Steps were taken by the guardian to rescind the trade with Cooper. Litigation followed in which Frank was successful in recovering the 40 acres which he had traded to Cooper. Frank then returned to that farm and still resides there.

Soon after the conclusion of that litigation this bill was filed. The estate of Mathias Larsen was revived, an administrator de bonis non was appointed, and made a party defendant herein. Lars Peter Petersen, executor of the estate of Mary Larsen, was made a party defendant, as well as Anna Christensen, administratrix of the estate of Frederick Christensen. Christensen was a brother of Mary Larsen. She gave to

him one-half of her estate, and to the other four defendants, who are children of a deceased brother, the other half.

The bill seeks to have all the assets of the estate of Mary Larsen declared to be assets of the estate of Mathias Larsen, and also prays to have set aside the conveyances between Frank and his mother, on the ground that Frank was not mentally competent to transact such business, and on the further ground that he was defrauded by his mother and Frederick Christensen.

The chancellor found that Frank was mentally incompetent at the dates of the conveyances, that he was unduly influenced to make the last deed by his mother and Christensen, and, therefore, set them aside. The construction which he placed upon the will of Mathias Larsen was that it gave a life estate to Mary Larsen, with the privilege of using from the *corpus* of the estate, if necessary, for her support, and that the income or accumulations from the life estate, which were unused at her death, belonged to the estate of Mathias Larsen.

The questions which are submitted to this court for its consideration are two:

(1) The construction of clauses 1 and 2 of the will of Mathias Larsen.

(2) Whether the conveyances between Frank and his mother should be set aside on the ground of Frank's mental incompetency.

1. It is conceded that Mary Larsen had no means of her own at the time of her husband's death. It is also conceded that the funds used by her in purchasing the interest of the children were derived from her life estate. When these purchases were made she was assisted financially by her brother, Frederick Christensen. When she finally sold the place the balance due him was paid from the Nelson contract.

The language of the will is not ambiguous. It very

clearly gives Mary Larsen a life estate in both the real and personal property, with the power to use from the *corpus* of the estate, if necessary, for her reasonable care and support. This construction is supported by the following authorities: *Glover* v. *Reid,* 80 Mich. 228; *Jones* v. *Deming,* 91 Mich. 481; *Gadd* v. *Stoner,* 113 Mich. 689; *In re Moor's Estate,* 163 Mich. 353; *Bateman* v. *Case,* 170 Mich. 617.

It appears to be conceded that the personal property was exhausted in paying the debts, so we may dismiss that from our consideration. As owner of a life estate in the real estate she was entitled to the income and rents. These belonged to her to do with as she saw fit. This is the general rule. *Braswell* v. *Morehead,* Busbee's Eq. (45 N. C.) 26 (57 Am. Dec. 587, and note); *Millen* v. *Guerrard,* 67 Ga. 284; 17 R. C. L. pp. 628, 629.

In the last authority cited, it is said:

"As a general rule the life tenant is entitled during the continuance of the life estate to the entire income from the property, real or personal, in which he has a life interest, but he has no right to use the *corpus.* * * *

"The rents received from real estate during the existence of the life estate belong to the life tenant, and it has been held that a bonus paid during the continuance of the life estate for the extension of a lease also belongs to the life tenant as of the time when it was made."

We perceive no reason why this general rule should not apply to the life estate which was given to Mary Larsen by her husband's will. The language of the will indicates that the intention of the testator was in accord with this general rule. He gave her a life estate in all of his property with no restrictions as to income. As such legatee she was entitled to the possession of the estate, and had title to whatever income it yielded. If she were the absolute owner of a life estate in the farm she must have been entitled

to what it produced. After her husband's death she remained on the farm, and by her industry and thrift saved nearly enough to purchase the interests of the adopted children, and at her death left property of the value of $2,650. The contention is now made that this sum belongs to the estate of her deceased husband because it is income from her life estate. We cannot approve of this conclusion. The general rule of law does not so decree. The language of the will does not so order, and simple justice does not so demand. Neither are we able to agree with plaintiff's contention that the situation is ruled by the cases of *Hull* v. *Hull*, 122 Mich. 338, and *In re Mallary's Estate*, 127 Mich. 119.

In *Hull* v. *Hull*, the testator created a trust fund of all of his property and provided that during his widow's natural life she should have it as needed for her support and comfort, and named trustees to see that the provision was carried out to the letter.

In *Re Mallary's Estate*, the testator did substantially the same as was done in *Hull* v. *Hull*, except that the widow was made the sole trustee and was not required to give bond.

In the present case Mary Larsen was given a distinct estate for life—a freehold estate. If the estate were hers for life the income was hers. Mathias Larsen made no attempt to control the income from the life estate. He directed that if the income were insufficient to properly care for her she should have the right to sell and use from the *corpus* of the estate, but this privilege she never exercised. These differences make the cases cited easily distinguishable from the present one.

Our conclusion is that the will gives to Mary Larsen a life estate in the property, both real and personal, of Mathias Larsen, and that the rents and income derived therefrom during her life belonged to her, was her sole property, and now belong to her estate.

2. Should the conveyances between Frank and his mother be set aside? Frank Larsen, at the time of the trial, was 51 years of age. He had been a farmer all his life. When a young man his foster father died. He took charge of the farm and managed it, and his foster mother kept the house, and the record shows that he has been reasonably successful as a farmer. All the witnesses agree that he is not bright, that he is peculiar, that he is quick tempered, and when angry is boisterous and says and does foolish things. He married late in life and was, at least before marriage, addicted to the habit of self abuse. It also appears that he was troubled at times with what he called "blue spells" and complained that his head felt bad and was not right.

Several witnesses appeared on behalf of plaintiff. Some of them were neighbors, others were business and professional people of Greenville, with whom he had come in contact, either in a business or social way. Nearly all of them gave it as their opinion that he was not mentally competent to have the charge of his own affairs. Several near neighbors who had known him from childhood expressed the opposite opinion. Some business and professional people with whom he had done business in Greenville, also expressed an opposite opinion. All of the witnesses for the defendants, and some of those who appeared for the plaintiff, admitted that they had never heard his ability to manage his own affairs questioned until his litigation with Cooper. It would be unprofitable to analyze the testimony of each witness, but we may, with some profit, refer to certain impressions which we have received in reading the voluminous record.

(a) While most of plaintiff's witnesses expressed the opinion that Larsen was not competent to have charge of his affairs, the reasons which they gave for thinking so are not very satisfactory. The record

shows without dispute that Frank had bought and sold
several farms, had worked and managed them, and
marketed the produce, and the only competent proof
of specific instances in which he had made bad bar-
gains was the real estate deal with Cooper and one
horse trade.

(b) At the time of the hearing of this case Larsen
appeared to be unfriendly toward his guardian. He
testified in the case, and this attitude subjected him
to a severe cross-examination by his own counsel. The
examination was one well calculated to develop his
mental weaknesses, if he had any. During his ex-
amination he was able to, and did, take care of himself
as well as any other witness in the case. His answers
indicated that he comprehended the questions, an-
swered the precise question asked without elaboration,
and drew some very nice distinctions. Neither his
direct nor cross-examination gives any hint that he
was mentally incompetent at the time of the trial.
It should be mentioned in this connection that plain-
tiff's counsel concedes that he was unusually lucid on
that occasion.

(c) After trading farms with Cooper, Larsen ap-
pears to have regretted it and worried over it to the
extent that he could not work. He wanted to trade
back but Cooper refused. He induced his uncle to
intercede for him but this was of no avail. He con-
sulted with his friends and some one suggested to him
that an effective way to get his property back was to
have himself declared incompetent by the probate
court. This appealed to him and he set about to have
this done. His wife made the application and he
solicited witnesses to swear that he was incompetent.
Two physicians were asked to examine him. They
did so, and made a report that nothing was found
indicating that he needed a guardian. They were not
called to testify at the hearing. In the suit with
Cooper he again solicited witnesses to testify that he

was incompetent, as he stated to them, so that he could get his place back. It is not usual for persons who are really suffering from this malady to capitalize it in this manner. It is very unusual for one who is in this unfortunate condition to solicit witnesses to testify to the fact. While these acts on his part are not conclusive of his competency they show a mental grasp and resourcefulness which throw suspicion on the claim that he is mentally incompetent.

(d) We have been influenced to some extent in reaching a conclusion on this question by the testimony of Dr. Johnson, who was called upon to make an examination of Larsen, prior to his being declared incompetent by the probate court, and who did make the examination in company with Dr. Bower. Dr. Johnson testified upon the hearing of this case. His testimony in part follows:

"I think our examination that day covered about an hour's time; we talked with him a good deal during that period.

"Q. What range of subjects did you talk about?

"A. First I think we went into his history as carefully as we could, relative to where he was born, the history of his family, his elemental training, what school training he had had, we questioned him relative to work he had while in school, the studies he pursued; questioned him relative to various details in history for instance; we asked him a few things in mathematics; we questioned the man relative to his habits, in other words took a very close personal history as we could get it that length of time; tried to draw out the fact that he had some hallucinations, illusions or delusions; we went into his physical condition. I remember we talked to him relative to various matters of judgment, relative to farming; the best time to buy a farm, how he would judge a good farm, the best time to sell crops, the best time to harvest crops, the best time to plant them, various ideas relative to farming. We went into the matter of his physical condition, asked him various questions about that, about sleeping, appetite and other things; his memory, we tried to test out his memory, general condition. I

think that about covers the field as near as I can remember.

"We did not that day observe any indications of hallucinations. We observed that he has some peculiarities of speech. We did not examine to ascertain what caused that peculiarity of speech.

"*Q.* When you got his speech so you understood his talk, or his reply, you say it was sane and all right?

"*A.* We didn't find anything wrong with him."

We conclude that the most that can be claimed for the testimony bearing on the question of mental capacity is that Frank Larsen was a man somewhat below the average intelligence, that he was peculiar in many ways, and that he had lessened his physical and mental vigor to some extent by his unfortunate habit, but we do not think the record as a whole establishes the fact that Larsen was mentally incompetent to have the care and charge of his own affairs. Notwithstanding all the speculations with reference to his capacity, the fact remains that he has been a farmer all of his life, has worked and managed his own farms, made his own deals, and done his own marketing, and did it as well and successfully as it is usually done, and that he is still living on a farm of his own, worth from $1,500 to $1,800, with no debts, and managing it and working it without the aid and judgment of any one but himself. We must conclude, therefore, that the charge of mental incompetency is not sustained.

On the remaining question we find nothing in the record which convinces us that Frank was unduly influenced or defrauded either in the purchase or sale of the old farm. He testified that he concluded he would rather have a smaller farm and be free of debt, and beside he felt his mother should have the home farm. If it can be said that Frank did not receive full value for the farm when he sold it to his mother, we think it is equally true that she did not receive

full value when she sold it to him. When he left the farm he had $900 in money paid by his mother, $750 which he had made during the time that he owned it, and all the personal property including the household goods and farm machinery.

We are of the opinion that the decree should be reversed and plaintiff's bill dismissed, with costs of both courts to the appealing defendants to be taxed against the plaintiff personally.

In granting costs against the guardian personally we do so feeling that he did not institute and carry on the litigation with the good faith which is demanded of an official in a trust relation. Frank Larsen testified that he was opposed to the litigation and did not want it carried on. The guardian testified that Frank was not consulted before the suit was brought, that he did not approve of it, that he became angry because it was instituted and that it was carried on against his protest. This testimony, considered in connection with the merits of the controversy, has led us to the conclusion already announced.

MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred with BIRD, J.

OSTRANDER, C. J. (*dissenting*). I concur in reversing the decree of the court below but not in the conclusion that the guardian, plaintiff, should personally pay the costs. The court below granted the relief prayed for. So far as the probate records are concerned, they show a regular appointment of the plaintiff as guardian. The fact that the guardian of an incompetent is not governed by the advice of his ward does not, in my opinion, furnish a reason for subjecting him to the payment of the costs of unsuccessful litigation instituted by him in his ward's behalf. I find no evidence of the bad faith of the guardian.